OPINION OF THE COURT
Friedman, J.
At issue on this appeal is the legal sufficiency under New York law of a claim for fraudulent inducement to continue to hold, rather than sell, a large block of the common stock of defendant American International Group, Inc. (AIG), a publicly traded security. In a nutshell, the theory of the complaint (as amplified by affidavits and testimony offered in response to the motion to dismiss) is that plaintiff The Starr. Foundation (the Foundation), which was seeking to divest itself of most of the AIG stock that formed its original endowment, was induced to set an excessively high “floor price” ($65 per share) for the sale of the stock by public statements defendants made beginning in August 2007 that allegedly misrepresented (by minimizing) the degree of risk attached to AIG’s large credit default swap (CDS) portfolio. Allegedly in reliance on these statements, the Foundation suspended its sales of the stock in October 2007, when AIG’s share price fell below $65. But for defendants’ misrepresentations, the Foundation claims, it would have set a lower floor price for selling its AIG stock and, as a result, would have accelerated its divestiture plan and sold all of its remaining AIG stock within two weeks.[1] In fact, however, the Foundation ceased *27 selling its AIG stock in October 2007, and therefore still held approximately 15.5 million AIG shares in February and March of 2008, when the value of AIG stock declined substantially as AIG reported billions in CDS losses due to the mounting number of defaults on real estate mortgages.
In this action, the Foundation apparently seeks to recover the value it hypothetically would have realized for its 15.5 million shares of AIG stock in the late summer or fall of 2007 had defendants at that time accurately disclosed the risk of AIG’s CDS portfolio, less the stock’s value after the alleged fraud ceased to be operative in early 2008. If the case were to go to trial, to establish liability and damages the Foundation would be required (in addition to proving the fraudulent nature of the statements complained of) somehow to come forward with a nonspeculative basis for determining how accurate disclosure of the risk of the CDS portfolio beginning in August 2007—and such disclosure’s hypothetical effect on the market at that time—would have affected the Foundation’s decision to sell or retain its AIG stock and the amount it would have received for the stock it hypothetically would have sold. However, the Foundation’s “holder” claim fails, as a matter of law, because it violates the “out-of-pocket” rule governing damages recoverable for fraud. Accordingly, we affirm the dismissal of the complaint.[2]
As should be evident from the foregoing summary of the allegations on which the claim is based, the Foundation is seeking to recover the value it would have realized by selling its AIG shares before the stock’s price sharply declined in early 2008 due to the reporting of its CDS losses. Manifestly, such a recovery would violate New York’s long-standing out-of-pocket rule, under which “ ‘[t]he true measure of damages [for fraud] is indemnity for the actual pecuniary loss sustained as the direct result of the wrong’ ” (Lama Holding Co. v Smith Barney, 88 NY2d 413, 421 [1996], quoting Reno v Bull, 226 NY 546, 553 [1919]). Such damages “are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained,” and “there can be no recovery of profits which would have been realized in the absence of fraud” (Lama, 88 NY2d at 421; see also Reno v *28 Bull, 226 NY at 553 [“The purpose of an action for deceit is to indemnify the party injured,” and “(a)ll elements of profit are excluded”]).
This action is virtually the paradigm of the kind of claim that is barred by the out-of-pocket rule. As the Court of Appeals noted in Lama, under the out-of-pocket rule “the loss of an alternative contractual bargain . . . cannot serve as a basis for fraud or misrepresentation damages because the loss of the bargain was ‘undeterminable and speculative’ ” (88 NY2d at 422, quoting Dress Shirt Sales v Hotel Martinique Assoc., 12 NY2d 339, 344 [1963]; see also Rather v CBS Corp., 68 AD3d 49, 58 [2009], lv denied 13 NY3d 715 [2010]; Geary v Hunton & Williams, 257 AD2d 482 [1999]; Alpert v Shea Gould Climenko & Casey, 160 AD2d 67, 72 [1990]). Here, the Foundation seeks to recover the value it might have realized from selling its shares during a period when it chose to hold, under hypothetical market conditions for AIG stock (assuming disclosures different from those actually made) that never , existed. A lost bargain more “undeterminable and speculative” than this is difficult to imagine.[3]
The inconsistency of the Foundation’s claim with the out-of-pocket rule emerges fully when one considers that the measure of damages under the rule is “the difference between the value of what was given up and what was received in exchange” (Mihalakis v Cabrini Med. Ctr. [CMC], 151 AD2d 345, 346 [1989], lv dismissed in part, denied in part 75 NY2d 790 [1990], citing Reno v Bull, 226 NY at 553). The Foundation does not allege any transaction in which it gave up anything in exchange for anything else. On the contrary, the Foundation complains that it was induced to continue holding its AIG stock for a certain period of time. In holding its stock, the Foundation did not lose or give up any value; rather, it remained in possession of the true value of the stock, whatever that value may have been at any given time. Thus, the Foundation did not suffer any out-of-pocket loss as a result of retaining its AIG stock. Further, the *29 decline in AIG’s share price for which recovery is sought was caused by the reporting of the company’s massive CDS losses. Since the CDS losses would have been incurred regardless of any earlier misrepresentations AIG made concerning the risk of the CDS portfolio, such alleged misrepresentations could not have been the cause of the decline of AIG’s stock price. In other words, the paper “loss” the Foundation seeks to recover in this action was caused by the underlying business decision of AIG’s management to build up the CDS portfolio on which the losses reported in early 2008 were sustained, not by the earlier alleged misrepresentations forming the basis of the Foundation’s complaint.[4]
As noted, the rationale of the out-of-pocket rale is that the value to the claimant of a hypothetical lost bargain is too “undeterminable and speculative” CLama, 88 NY2d at 422 [internal quotation marks and citation omitted]) to constitute a cognizable basis for damages. In this regard, the impermissibly speculative nature of the recovery sought in this action emerges from a comparison of the Foundation’s holder claim against AIG with a more typical claim for fraud in the inducement of an actual purchase or sale of a publicly traded security. In the latter case, the claim is based on a transaction involving a particular quantity of the security at a particular time, and, to determine damages, the factfinder need determine only the effect of an accurate disclosure on the price of the security at the particular time the transaction actually occurred. In the case of a holder claim seeking damages based on the value that would have been realized in a hypothetical sale, however, the degree of speculation in determining damages is essentially quadrupled, in that the factfinder must determine (1) whether the claimant would have engaged in a transaction at all if there had been accurate disclosure of the relevant information, (2) the time frame within which the hypothetical transaction or series of transactions would have occurred, (3) the quantity of the security the claimant would have sold, and (4) the effect truthful disclosure *30 would have had on the price of the security within the relevant time frame. These cumulative layers of uncertainty amount to a difference in the quality, not just the quantity, of speculation, and take the claim out of the realm of cognizable damages.
In fact, this case well illustrates the speculative nature of the holder claimant’s allegation that it was injured at all. Specifically, after the alleged fraud was exposed upon the reporting of AIG’s massive CDS losses in February and March of 2008, the Foundation continued to hold its remaining AIG stock through all the ensuing drops in share price. The speculative nature of the claim is underscored by the following testimony given by the Foundation’s president, Florence A. Davis, under questioning by defense counsel at a hearing before the motion court:
“[defense counsel]: ... If the exact same disclosures that were made in February 2008 had been moved up in time and were made in August 2007, would you have sold all of your AIG stock which you now own if the price then had declined into the low forties just as it did in February of ‘08 when the losses were disclosed?
“You cannot answer that question; isn’t that correct?
“[ms. davis]: I can’t speculate about that.”
As the motion court aptly noted, neither would it be appropriate for a jury to speculate on the answer to this question.
In other cases, plaintiffs asserting holder claims have argued that the price of the stock fell to a lower level after the exposure of the alleged fraud than it would have reached absent the fraud due to a loss of confidence in management’s integrity attributable to the revelation of the inaccuracy of its earlier representations (see Small v Fritz Cos., Inc., 30 Cal 4th 167, 191, 65 P3d 1255, 1270 [2003, Kennard, J., concurring] [“revelations of false financial statements and management misrepresentations raise a host of concerns that may lead to a decline in stock values beyond that warranted by the financial information itself’]). Although it is not evident to us that the Foundation makes any such argument here, the dissent makes this argument on the Foundation’s behalf, relying on Justice Kennard’s concurrence in Small. We disagree. In our view, such a theory is “too remote and speculative to support cognizable damages” (30 Cal 4th at 206, 65 P3d at 1280 [Brown, J., concurring in part and dissenting in part]). As Justice Brown elaborated in Small:
*31 [S]uch investor speculation could occur in every case in which a company announces bad news or issues a negative correction. Thus, any drop in stock price allegedly caused by investor speculation that earlier company statements were dishonestly or incompetently false will occur regardless of whether the defendants acted fraudulently. As such, defendants’ alleged misrepresentations could not have caused the drop in stock price resulting from such investor speculation. In any event, any claim that the mere possibility of fraudulent conduct by defendants may have caused a greater drop in investor confidence and a correspondingly greater drop in stock price than would have otherwise occurred is highly speculative and should not be cognizable as a matter of law” (30 Cal 4th at 206-207, 65 P3d at 1280).
To the extent the Foundation argues that the ultimate drop in AIG’s share price was greater than it otherwise would have been because general market conditions had worsened by the time the alleged misrepresentations were corrected, the loss was not related to the subject of the alleged misrepresentations and therefore was not proximately caused by them (see Laub v Faessel, 297 AD2d 28, 31 [2002]; Restatement [Second] of Torts § 548A [1977] [“A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance”]).
Notably, a federal district court applying Connecticut law dismissed a holder claim similar to that asserted by the Foundation on the ground that “the claims for damages based on the plaintiffs’ failure to sell or hedge their stock are too speculative to be actionable” (Chanoff v United States Surgical Corp., 857 F Supp 1011, 1018 [D Conn 1994], affd 31 F3d 66 [2d Cir 1994], cert denied 513 US 1058 [1994]). In reaching that determination, the Chanoff court rejected arguments bearing a strong resemblance to the Foundation’s arguments against application of the out-of-pocket rule here:
“In addition, the defendants argue, somewhat compellingly, that the plaintiffs have not alleged cognizable loss because plaintiffs cannot claim the right to profit from what they allege was an unlawfully inflated stock value. In rebuttal, the plaintiffs *32 argue that had the disclosures been timely made . . . , the market would not have responded as drastically as it did when the disclosures were made in 1993, thereby characterizing their loss as the difference in the impact of the disclosures on the market, not lost profits. Yet this argument is merely a creative costume for the lost profits claim, which courts have clearly rejected. Moreover, even if the court accepted plaintiffs’ attempt to distinguish their claim, the claim would not be actionable as it is not subject to even reasonable estimation; rather, because . . . there is not one precise point at which the defendants’ duty to disclose information ... attached, and in light of the difficulty in quantifying the value of earlier disclosure, the actual calculation of such damages would be intractable at best” (id. [footnote omitted]).
In this case, the calculation of damages would be no less intractable than in Chanoff. Significantly, the Foundation simply asserts, without meaningful explanation, that some unspecified expert testimony would enable it to establish the effect on the market for AIG stock of earlier disclosure of the true risk of the CDS portfolio. Further, while the Foundation claims that such earlier disclosure would have influenced it to set a lower floor price for the sale of its AIG stock, it offers no description of the methodology that was used to set the floor price, nor does it give even a rough estimate of the floor price that would have been set had AIG accurately represented the risk of the CDS portfolio in the late summer and fall of 2007. The dissent’s contention that we should not require the Foundation “to divulge its methodology” on a pleading motion, if heeded, would eviscerate the dissent’s own stated position that the proponent of a holder claim should be required to meet the heightened pleading standard articulated by the California Supreme Court in Small. Without giving some hint of the methodology it used to set its floor price, the Foundation cannot allege with particularity that, assuming accurate disclosure of the relevant risk, it “would have sold the [AIG] stock, how many shares [it] would have sold, and when the sale would have taken place” (30 Cal 4th at 184, 65 P3d at 1265). In the absence of even a general explanation of the methodology that was used for this purpose, the complaint fails to “allege actions, as distinguished from unspoken and unrecorded thoughts and decisions, that would indicate that the [Foundation] actually relied on the *33 misrepresentations” (id.). Moreover, the Foundation obviously has no need for discovery concerning its own internal actions and deliberations.
In support of its position that the complaint should be reinstated, the dissent chiefly relies on a case this Court decided more than 80 years ago, Continental Ins. Co. v Mercadante (222 App Div 181 [1927]). Assuming the continuing vitality of Mercadante, it offers no support for sustaining a fraud cause of action that, like the Foundation’s, seeks recovery for the loss of the value that might have been realized in a hypothetical market exchange that never took place. The plaintiffs in Mercadante alleged that, as a result of being fraudulently induced to refrain from selling their bonds, they were ultimately left with instruments that were “substantially worthless” (222 App Div at 182). Thus, as defendants correctly observe, the Mercadante plaintiffs did suffer an out-of-pocket loss, specifically, the loss of their investment in the bonds. Nothing in Mercadante states or implies that the measure of damages in that case would have been the amount for which the bonds could have been sold at some point before they lost their value.[5]
For the foregoing reasons, the out-of-pocket rule requires us to affirm the dismissal of the Foundation’s complaint. Since that issue is dispositive of the appeal, we need not reach the Foundation’s remaining arguments.
Accordingly, the orders of the Supreme Court, New York County (Charles E. Ramos, J.), entered December 3 and 19, 2008, which granted defendants’ motion to dismiss the complaint, should be affirmed, with costs.

. The supplemental affidavits and testimony offered in response to the motion to dismiss clarify that the Foundation is alleging that accurate disclosure of the risk of the CDS portfolio would have influenced the Foundation to set a lower floor price for selling its AIG stock. Since having a floor price means that sales would have been suspended had the share price hypothetically declined below that level, it is not clear what basis the Foundation has for alleging that accurate disclosure would have caused it to sell all of its remaining AIG stock within two weeks. In this regard, it is notable that, when AIG’s share price declined to below $40 in March 2008 after the huge losses of its CDS portfolio were reported, the Foundation continued to hold its AIG stock because, as it now explains, the share price was below book value.

. We note that the Foundation’s claim is legally insufficient whether or not the Foundation has properly asserted it as a direct claim on its own behalf as an individual stockholder rather than as a derivative claim against management on behalf of the corporation. If derivative, the action would be subject to dismissal for failure to allege demand on the board. Accordingly, we need not reach the question of whether the claim is direct or derivative.

. It should be noted, however, that defendants go astray to the extent they may be arguing that a transaction in which a party realizes a profit can never form the basis for a fraud claim by that party. A plaintiff who is fraudulently induced to enter into a transaction in which he accepts something of less value than what he gives up can state a cause of action for fraud, even if that plaintiff happened to make a profit on the deal because what he received was of greater value than his cost basis in what he gave up. In the instant case, however, the Foundation seeks to recover the value it hypothetically might have received in a transaction that never took place.

. The reliance of the Foundation and the dissent on Bernstein v Kelso & Co. (231 AD2d 314 [1997]) is misplaced. In Bernstein, this Court reinstated a fraud claim by a plaintiff who alleged that he had been fraudulently induced to sell his stock for an unfairly low price in a buyout transaction. The decision simply applied the out-of-pocket rule to a case where the seller of stock claims to have been defrauded, since the Bernstein plaintiff “sought to recover the difference between the price he received in the sale of the company and the price he would have received had his employees and Kelso [the buyer] not deceived him” (231 AD2d at 322).

. Hotaling v Leach & Co. (247 NY 84 [1928]), on which the Foundation also relies, is distinguishable along the same lines as Mercadante. In this connection, it should be noted that the out-of-pocket rule is not an obstacle to a creditor’s claim that it was fraudulently induced to forbear from taking steps to collect a debt (see Foothill Capital Corp. v Grant Thornton, L.L.P., 276 AD2d 437, 438 [2000]).