13-4488-cv(L)
*AHW Investment Partnership, et al. v. Citigroup Inc., et al.*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2014

(Argued: January 9, 2015        Decided: November 25, 2015)

Docket Nos. 13-4488-cv(L), 13-4504-cv(XAP)

AHW INVESTMENT PARTNERSHIP, MFS, INC., ANGELA H. WILLIAMS, AS TRUSTEE OF THE ANGELA H. WILLIAMS GRANTOR RETAINED ANNUITY TRUST UAD MARCH 24, 2006, THE ANGELA WILLIAMS GRANTOR RETAINED ANNUITY TRUST UAD APRIL 17, 2006, THE ANGELA WILLIAMS GRANTOR RETAINED ANNUITY TRUST UAD MAY 9, 2006, THE ANGELA WILLIAMS GRANTOR RETAINED ANNUITY TRUST UAD NOVEMBER 1, 2007, THE ANGELA WILLIAMS GRANTOR RETAINED ANNUITY TRUST UAD MAY 1, 2008, THE ANGELA WILLIAMS GRANTOR RETAINED ANNUITY TRUST UAD JULY 1, 2008, AND THE ANGELA WILLIAMS GRANTOR RETAINED ANNUITY TRUST UAD NOVEMBER 21, 2008,

*Plaintiffs-Appellants–Cross-Appellees*,

−v.−

CITIGROUP INC., CHARLES PRINCE, VIKRAM PANDIT, GARY CRITTENDEN, ROBERT RUBIN, ROBERT DRUSKIN, THOMAS G. MAHERAS, MICHAEL STUART KLEIN, DAVID C. BUSHNELL,

*Defendants-Appellees–Cross-Appellants*.

B e f o r e :

HALL, LYNCH, and CARNEY, *Circuit Judges*.

———————

Plaintiffs—a corporation, partnership, and seven grantor-retained annuity trusts controlled by Angela and Arthur Williams—appeal from an October 30, 2013 judgment of the United States District Court for the Southern District of New York (Sidney H. Stein, *Judge*), dismissing their amended complaint for failure to state a claim.   Plaintiffs allege that they suffered losses in excess of $800 million when, from May 2007 through March 2009, they refrained from selling their shares of Citigroup stock based on the fraud and negligent misrepresentations of defendants Citigroup and Citigroup executives. Defendants cross-appeal, arguing that the District Court erred simply by addressing the adequacy of plaintiffs' substantive claims as "holders" of the shares during a period of decline in share value:   According to defendants, Delaware law mandates that such claims be brought in a shareholder derivative action, not as direct claims.   If defendants are correct, plaintiffs—who are no longer Citigroup shareholders—lack standing to maintain this suit.   The characterization of plaintiffs' claims as direct or derivative calls for an interpretation of an unsettled area of Delaware law, and we anticipate that the issue's resolution will have significance well beyond the instant suit. Accordingly, we respectfully certify to the Delaware Supreme Court the question whether, under Delaware law, "holder" claims such as those plaintiffs attempt to assert are properly brought in a direct or derivative action.

QUESTION CERTIFIED.

———————

STEVEN F. MOLO (Robert K. Kry and Hassan A. Shah, *on the brief*), MoloLamken LLP, New York, NY, and Jacob H. Zamansky, Zamansky LLC, New York, NY, *for Plaintiffs-Appellants-Cross-Appellees.*

WALTER RIEMAN (Brad S. Karp, Susanna M. Buergel, Jane B. O'Brien, and Stephen P. Lamb, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, *for Defendants-Appellees-Cross-Appellants.*

———————

SUSAN L. CARNEY, *Circuit Judge*:

Plaintiffs—a corporation, partnership, and seven grantor-retained annuity trusts ("GRATs") controlled by Florida residents Angela and Arthur Williams— appeal from an October 30, 2013 judgment of the United States District Court for the Southern District of New York (Sidney H. Stein, *Judge*), dismissing their amended complaint for failure to state a claim. Plaintiffs allege that they suffered losses in excess of $800 million when, from May 2007 through March 2009, they refrained from selling their shares of Citigroup stock based on the fraudulent and negligent misrepresentations of defendants Citigroup and Citigroup executives. Defendants cross-appeal, arguing that the District Court erred by addressing the adequacy of plaintiffs' substantive claims as "holders" of the shares during a period of decline in share value: According to defendants, Delaware law mandates that such claims be brought in a shareholder derivative action, not as direct claims (as plaintiffs have done).

If defendants are correct, plaintiffs—who are no longer Citigroup shareholders—lack standing to maintain this suit. The proper characterization of plaintiffs' claims as direct or derivative calls for an interpretation of an unsettled area of Delaware law in which there appear to be conflicting decisions, and we anticipate that the resolution of this issue will have significance well

3

beyond the instant suit. *See* Del. Sup. Ct. R. 41. Accordingly, we respectfully certify to the Delaware Supreme Court the question whether, under Delaware law, "holder" claims such as those plaintiffs attempt to assert are properly brought in a direct or derivative action.

## BACKGROUND

### I. Factual Background[1]

In 1977, Arthur L. Williams founded an insurance company that by 1989 had become very successful and merged with Travelers Group. In 1998, Travelers Group merged with Citibank to become Citigroup. In the 1998 merger, Williams acquired 17.6 million shares of Citigroup common stock, then valued at approximately $616 million, or $35 per share. By early 2007, "for tax, estate and investment-planning purposes," the shares had been transferred to a partnership, a corporation, and various GRATs controlled by Arthur and his wife, Angela. Am. Compl. ¶ 3.

In May 2007, Williams made a plan to sell his entire Citigroup position, based on the shared recommendation of his financial advisors at that time. In

---

[1] This statement of facts is drawn from the allegations of plaintiffs' amended complaint. For purposes of this appeal, we assume the allegations to be true. *Cruz v. TD Bank, N.A.*, 711 F.3d 261, 264 (2d Cir. 2013).

the advisors' view, the Citigroup stock price was then "close to the 'top' for the near-term and [it was] a good time for Williams to sell." *Id.* ¶ 202. He began implementing this plan on May 17, 2007, when he sold one million of his 17.6 million shares at $55 per share.

Against the counsel of his advisors and despite his plans to sell, Williams "delayed executing his sales" of the remainder of his shares when, later in 2007, "Citigroup's stock price declined as the markets began to experience volatility from the subprime mortgage crisis." *Id.* ¶ 174. Williams believed that Citigroup had "little downside risk and its shares were likely being dragged down by the fortunes of other players" and that "once the market understood . . . the different—and far superior—risk posture of Citigroup, its shares would recover and he could complete his planned sale as intended." *Id.* ¶ 175. Plaintiffs allege that Williams formulated this belief in reliance on Citigroup's "public statements and financial reports" that "concealed the full extent and impairment of billions in 'toxic' assets, including [collateralized debt obligations] backed by subprime assets." *Id.* ¶ 51; *see also* ¶¶ 175, 176. Plaintiffs further allege that Citigroup "gave investors the impression that it was reducing and prudently managing its risks, which was simply not true." *Id.* ¶ 51.

5

In the sixteen months that followed his initial sale of one million shares, Williams "continually tried to choose the appropriate time to complete the liquidation of his position in order to minimize his damages." *Id.* ¶ 177. But, allegedly misled by Citigroup's misrepresentations in "conference calls, investor slideshows, earnings releases, public filings and statements from senior officers," Williams held on to his remaining 16.6 million shares as the stock price plummeted to $3.09 per share. *Id.* ¶¶ 169, 172. He "considered" selling in December 2007, on August 20, 2008, and on December 2, 2008. *Id.* ¶¶ 178–80. It was not until March 2009, however, "by which time William's [sic] faith in the truthfulness of the Company had finally been erased, [that] he sold his remaining 16.6 million shares at a price of $3.09 per share." *Id.* ¶ 172. Plaintiffs maintain that, had Williams received truthful and accurate information from Citigroup, he would have sold his entire position on May 17, 2007, when the "true value" of the stock was $51.59.[2] *Id.* ¶ 171.

Williams thus calculates that his reliance on Citigroup's misrepresentations resulted in losses to him, his wife, and their controlled entities of over $800 million.

---

[2] Although Williams actually sold Citigroup stock at $55 per share on May 17, 2007, plaintiffs assert that the "true value" of the stock on the date—*i.e.*, what the price would have been had Citigroup fully disclosed its subprime exposure—was $51.59 per share.

## II.    Procedural Background

Having filed their original complaint in December 2010, in July 2011 plaintiffs filed the amended complaint at issue here.   In it, they seek damages for negligent misrepresentation and for common law fraud.   Defendants moved to dismiss, arguing first that plaintiffs lack standing because under Delaware law their claims are derivative, and second, that under New York law the alleged misrepresentations are not actionable.

In a 2013 opinion and order, the District Court granted defendants' motion and dismissed the amended complaint with prejudice.   *AHW Inv. P'ship v. Citigroup Inc.*, 980 F. Supp. 2d 510, 527 (S.D.N.Y. 2013).   Applying Delaware law, the District Court first "reject[ed] defendants' contention that [the] claims are in reality derivative claims brought on behalf of Citigroup."   *Id.* at 516.   It "recognize[d] a tension" in the Delaware precedent, but nevertheless concluded that "plaintiffs, not Citigroup, are the victims of Citigroup and the officer defendants' alleged deception, and therefore plaintiffs are the ones with standing to sue."   *Id.* at 517.   The District Court then conducted a conflict of laws analysis and concluded that New York law—as opposed to Florida law, as urged

7

by plaintiffs[3]—governed the substance of plaintiffs' claims. Applying New York law, the court determined that both the negligent misrepresentation and the fraud allegations failed to state a claim; accordingly, it dismissed the complaint.

This appeal and cross-appeal followed.

**DISCUSSION**

We review *de novo* a district court's dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6), drawing all reasonable inferences in the plaintiff's favor. *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 181 (2d Cir. 2014) (per curiam).

On appeal, plaintiffs argue that the District Court erred by applying New York, not Florida, law to their claims, and that, even applying New York law, their fraud and negligent misrepresentation claims were sufficient to withstand a motion to dismiss. Defendants dispute these contentions and argue in their cross-appeal that, contrary to the District Court's conclusion, plaintiffs' claims are properly considered derivative rather than direct.

---

[3] The Williamses are both Florida residents. The plaintiff entities, which they control, were created under Nevada and Florida law.

8

If we accept defendants' argument, then the District Court lacked jurisdiction to adjudicate the sufficiency of plaintiffs' claims, and we must affirm the dismissal of the amended complaint without further considering plaintiffs' claims. *See Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336–37 (1990) (noting that the question whether an individual shareholder is suing to enforce his own rights versus those of the corporation presents an issue of prudential standing). The lack of prudential standing would present an independent basis for dismissing the complaint. *Id.* We therefore turn our attention first to the issues raised in defendants' cross-appeal.

## I. *Tooley* and its Application to Plaintiffs' Claims

In diversity cases such as this, "federal courts look to the laws of the forum state in deciding issues regarding conflicts of law." *Wall v. CSX Transportation, Inc.*, 471 F.3d 410, 415 (2d Cir. 2006). Plaintiffs filed their complaint in the Southern District of New York; therefore, we examine the law of New York, the forum state, to determine which state's substantive law governs the dispute.

Under New York law, we look to the law of the state of incorporation when adjudicating whether a claim is direct or derivative. *See Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir. 1980); *Seidl v. Am. Century Cos.*, 713 F. Supp. 2d 249, 255

9

(S.D.N.Y. 2010), *aff'd*, 427 F. App'x 35 (2d Cir. 2011). Because Citigroup is incorporated in Delaware, Delaware law controls whether plaintiffs' claims are properly characterized as direct or derivative. Plaintiffs mount no challenge to this conclusion.

The leading Delaware Supreme Court case on the direct/derivative dichotomy is widely acknowledged to be *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004). Like the District Court here, however, we perceive some tension between *Tooley* and later state court decisions—primarily lower court decisions, but also one decision of the Delaware Supreme Court that post-dates *Tooley*. Before considering how these later cases may have affected *Tooley*'s import, we first review *Tooley* in some detail, since it is central to our inquiry.

In *Tooley*, minority shareholder plaintiffs sought damages from the corporation on the basis of allegations that members of the corporation's board of directors breached their fiduciary duties to the corporation by agreeing to delay closing a proposed merger for twenty-two days, thereby depriving minority shareholders of use of the funds they were to receive upon closing for that twenty-two-day period. *Id.* at 1033–34. The Court of Chancery dismissed the action, concluding the plaintiffs' claim was derivative, not direct. It reasoned

10

that the wrong alleged did not cause plaintiffs a "special injury"—that is, "a wrong that is separate and distinct from that suffered by other shareholders." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, No. Civ. A. 18414-NC, 2003 WL 203060, at *3 (Del. Ch. Jan. 21, 2003) (internal quotation marks omitted). The "special injury" requirement was then used in Delaware courts to differentiate between direct and derivative claims, including claims that alleged breach of duty to shareholders through a defendant corporation's alleged misrepresentations. *See, e.g.*, *Manzo v. Rite Aid Corp.*, No. Civ. A. 18451-NC, 2002 WL 31926606, at *5–6 (Del. Ch. Dec. 19, 2002) (concluding that a "plaintiff must identify some resultant injury that . . . affects some shareholders disproportionately to their pro rata stock ownership" to state a direct claim based on the "depriv[ation] of accurate information upon which to base investment decisions"), *aff'd*, 825 A.2d 239 (Del. 2003).

On Tooley's appeal from the Court of Chancery decision, however, the Delaware Supreme Court expressly "disapprove[d] the use of the concept of 'special injury' as a tool" in distinguishing between direct and derivative claims. *Tooley*, 845 A.2d at 1035. The court held instead that "whether a stockholder's claim is derivative or direct . . . must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders,

11

individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Id.* at 1033 (emphasis in original). When deciding whether a claim is properly viewed as direct or derivative, it instructed, "a court should look to the nature of the wrong and to whom the relief should go." *Id.* at 1039.

Turning back to the Williamses' complaint, we see that *Tooley*'s two-part test suggests that the Williamses may bring their claims directly. With regard to "who suffered the alleged harm," it is true that in a general sense both plaintiffs and Citigroup suffered harm when the Company's share price fell over time as the extent of its investment in subprime-related assets came to light. But the harm for which plaintiffs seek recovery is more particularized: It arises from their detrimental reliance on what they cast as defendants' misrepresentations, made through "personal and direct communications" to them, not merely public announcements. *See, e.g.*, Am. Compl. ¶ 181 (describing the decision not to sell as being based on Arthur Williams's "personal and direct communications with senior Citigroup officers"); *id.* ¶¶ 291–92 (seeking relief for having been "the recipients of multiple misrepresentations and omissions of material fact" and alleging that "Defendants knew their statements to Plaintiffs concerning Citigroup's subprime exposure were false at the time they were made").

12

Because the harm alleged is inextricably linked to defendants' misstatements and the asserted breach of a duty of disclosure, the harm from the alleged misrepresentations may be said to have been suffered by "the suing stockholders, individually," not by "the corporation." And the complaint alleges that the misstatements were made in an attempt to cover up the harm already done to the corporation, not to have themselves caused the harm—further decoupling the harm allegedly suffered by the Williamses and that sustained by the corporation.

And as to the second *Tooley* question, it seems that the Williamses, not Citigroup, would "receive the benefit of any recovery." The complaint alleges that, "as a direct result of Defendants' fraudulent statements and Plaintiffs' reliance thereon, Plaintiffs suffered approximately $809,950,000 in compensatory damages." *Id.* ¶ 296. Theirs is fundamentally an action for compensatory damages, and if any party were to recover damages for the asserted misrepresentations (if actionable at all), it would be plaintiffs: It would be a strange outcome indeed for Citigroup to pay itself for losses sustained by certain shareholders arising from alleged misrepresentations made to those shareholders by the Company and its officers. Thus, our response to the second *Tooley* question also appears to support plaintiffs' argument that they may bring their claims directly.

In sum, *Tooley* suggests that the Williamses have stated direct claims. If *Tooley* were the only decision of the Delaware courts relevant to this action, we would likely conclude that plaintiffs may bring these claims directly.

## II. Delaware Courts' More Recent Application of *Tooley*

Subsequent developments in the Delaware courts' application of *Tooley* give us pause, however. As detailed below, in a number of cases the Delaware Chancery Court has found that claims that would be "direct" under the two-part *Tooley* test must nonetheless be brought "derivatively" because the claims are not "independent of any alleged injury to the corporation," *Tooley*, 845 A.2d at 1039. Relying on the same language from *Tooley*, a recent Delaware Supreme Court case may have given new life to the "special injury" requirement that was earlier disavowed in *Tooley*. We think that these developments have major implications for whether, under Delaware law, shareholder-plaintiffs in general, and the Williamses in particular, have stated direct or derivative claims.

In *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006), for example, the Delaware Supreme Court reviewed an action brought by a group of minority shareholders against the corporation's directors and chief executive officer for breach of fiduciary duty related to an alleged overpayment to the CEO. The court held

14

that when a claim is based on "any dilution in value of the corporation's stock," the claim is generally derivative, because the loss of value "is merely the unavoidable result . . . of the reduction in the value of the entire corporate entity." *Id.* at 99 (applying *Tooley* to a claim of corporate overpayment for an asset).

Similarly, in *In re J.P. Morgan Chase & Co. Shareholder Litigation*, 906 A.2d 808 (Del. Ch. 2005), *aff'd on other grounds*, 906 A.2d 766 (Del. 2006), the plaintiff stockholders filed what they contended were direct claims based on the defendant company's alleged overpayment in a merger with another bank, *id.* at 812. Plaintiffs complained that the value of their shares was diluted by virtue of the overpayment, and that this was the type of harm that would give rise to a direct action under *Tooley*. *Id.* at 818. The Court of Chancery looked to "the heart of the[] complaint" and found that "[t]he plaintiffs, if they were harmed at all, were harmed indirectly and only because of their ownership in JPMC." *Id.* at 818–19. Therefore, the court concluded, "the plaintiffs' claim is derivative." *Id.* at 819.

These cases suggest that the two-part *Tooley* test may now have evolved and that the Williamses' claims here, which are tied to the dramatic plunge in the value of Citigroup stock between 2007 and 2009, might not be correctly treated as direct under Delaware law.

15

The Delaware Supreme Court's decision in *Feldman v. Cutaia*, 951 A.2d 727 (Del. 2008), lends support. In *Feldman*, the plaintiff alleged that the defendants breached their fiduciary duties when approving a merger agreement that resulted in an allegedly improper payout to company executives. *Id.* at 729–30. In affirming the Court of Chancery's dismissal of Feldman's claim as derivative, the Delaware Supreme Court observed the following, writing four years post-*Tooley*:

> Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature. The mere fact that the alleged harm is ultimately suffered by, or the recovery would ultimately inure to the benefit of, the stockholders does not make a claim direct under *Tooley*. In order to state a direct claim, the plaintiff must have suffered some individualized harm not suffered by all of the stockholders at large.

*Id.* at 733.

*Feldman* thus casts doubt on the viability of plaintiffs' claims in two ways. First, the Williamses seek recovery for losses sustained as a result of the diminution of value in their Citigroup stock over a certain period. These are losses experienced by "all of [the] corporation's stockholders" who held stock for that same time, and each of them, like the rebuffed plaintiff Feldman, "would recover *pro rata* in proportion with their ownership of the corporation's stock"

16

were they to pursue claims.   Second, according to *Feldman*, a plaintiff must have "suffered some individualized harm not suffered by all of the stockholders at large."   *Id.*   Although the *reason* that the Williamses retained their shares might be individualized—*see* Am. Compl. ¶ 169 ("Williams made all of the investment decisions to hold . . . Citigroup shares, based entirely upon information and representations disseminated directly from the Company and its senior officers to him and his Advisors.")—the actual *harm* suffered was the loss in stock value during a period of retention, which was sustained by the stockholders at large. Thus, plaintiffs do not seem to meet the more recent requirements for stating direct claims that were articulated in *Feldman*.

To be clear, the *Feldman* court purports to rely on *Tooley*, not to overrule it. *See Feldman*, 951 A.2d at 732–33 (applying the *Tooley* analytical framework).   But the *Feldman* decision appears to us possibly to revive the "special injury" requirement disclaimed in *Tooley*.   As we have highlighted, under *Feldman*, "to state a direct claim, the plaintiff must have suffered some individualized harm not suffered by all of the stockholders at large."   *Id.* at 733.   As referenced earlier, *Tooley* purportedly did away with the requirement that, to state a direct claim, a plaintiff must identify "a wrong that is separate and distinct from that suffered by other shareholders."   845 A.2d at 1035 (internal quotation marks

17

omitted). Thus, it is not clear, after *Feldman*, whether *Tooley*'s rejection of the "special injury" requirement still accurately represents Delaware law, or whether a different distinction is being drawn.

In the Williamses' case, the District Court confronted this issue and concluded that, notwithstanding *Feldman*'s suggestion to the contrary, "plaintiffs' injuries are not depend[e]nt on Citigroup's injury." *AHW*, 980 F. Supp. 2d at 517. It explained insightfully that "plaintiffs can prevail without showing an injury to Citigroup because the nature of the allegation is that the misstatements and omissions *concealed damage to Citigroup's assets that had already been done*." *Id.* (internal quotation marks omitted) (emphasis added).

It is true that the misconduct alleged by the Williamses occurred after the damage to the Company had been done and that the ostensible purpose of the alleged misconduct was to conceal this damage. But the "claimed direct injury" here is the shrinking value in plaintiffs' stockholdings during the period in which defendants' statements convinced plaintiffs to retain their shares. The core of this injury is the decline in stock price, which of course reflects injury sustained

18

by the corporation. We therefore find it difficult to conclude that the Williamses' asserted injury is truly "independent" of any injury to Citigroup.[4]

Delaware case law interpreting *Tooley* does not, however, uniformly point toward a conclusion that the Williamses' claims are derivative. The Delaware Court of Chancery has held that when the gravamen of a plaintiff's claims is that the defendants "failed to disclose material information when they had a duty to disclose it and made other misleading or fraudulent statements," those claims are direct under Delaware law. *Albert v. Alex. Brown Mgmt. Servs., Inc.*, Nos. Civ. A. 762-N, 763-N, 2005 WL 2130607, at *12 (Del. Ch. Aug. 26, 2005). In *Albert*, plaintiffs—who were unitholders and limited partners in two exchange funds— claimed, among other things, that the fund managers withheld material information about the operation and performance of the funds, in breach of contract and breach of their fiduciary duty. *Id.* at *1–3. The court, applying *Tooley*, found that those claims were direct because (1) the disclosure violations were contractual and harmed the unitholders, not the partnership, by depriving them of the opportunity to withdraw money from the funds, and (2) the

---

[4] We have adopted such an analysis before, albeit in a non-precedential summary order. *See Elendow Fund, LLC v. Rye Inv. Mgmt.*, 588 F. App'x 27, 29 (2d Cir. 2014) (concluding that, because the plaintiff's injury was "intertwined" with that of the defendant fund, the action was derivative under Delaware law).

unitholders would receive any recovery. *Id.* at *12–13; *see also Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1181 n.54 (Del. Ch. 2006) ("[N]on-disclosure claims are direct claims where a defendant has failed to disclose material information when they had a duty to disclose it." (internal quotation marks omitted)). When we consider the core misconduct alleged in this case—defendants' misrepresentations both to the plaintiffs specifically and to the public generally—these two Delaware Chancery Court decisions suggest that, even under a standard evolved since *Tooley*, plaintiffs may have stated direct claims. Softening the import of *Brown* for the Williamses, however, the Williamses have alleged no contractual duty on Citigroup's part to disclose.

Nonetheless, Delaware cases post-*Tooley* complicate our analysis and suggest that the Williamses may lack standing to pursue their claims against defendants. Thus, our review of recent Delaware case law suggests a conclusion contrary to that we would have reached had we applied *Tooley* alone.

### III. Our Circuit's Application of *Tooley*

Our Circuit's own prior decisions applying Delaware law also cast doubt on whether the specific sort of claims advanced by the Williamses—those alleging harm based on the *retention* of stock in reliance on a defendant's

20

statements ("holder claims"), rather than the actual *purchase or sale* of stock—may be brought directly, absent some special relationship. Although we have not addressed the issue by precedential opinion,[5] our rulings suggest a view that such holder claims, in particular, are properly brought under Delaware law as derivative claims. The Delaware Supreme Court is of course free to reject these analyses, but we review them here briefly to illustrate our past understanding of *Tooley*.

In *Newman v. Family Management Corp.*, 530 F. App'x 21 (2d Cir. 2013), for example, we recently interpreted *Tooley* to require plaintiffs to allege a "unique injury" to assert a direct claim. *Id.* at 27.[6] The *Newman* plaintiffs were investors in a "sub-feeder fund" that was invested in the notorious Madoff Ponzi scheme via the defendant Family Management Corporation. *See Newman v. Family Mgmt. Corp.*, 748 F. Supp. 2d 299, 302, 304–05 (S.D.N.Y. 2010). Plaintiffs alleged,

---

[5] According to our Local Rules, "Rulings by summary order do not have precedential effect." 2d Cir. Local R. 32.1.1(b). "[T]he rationale underlying the Rule is that such orders, being summary, frequently do not set out the factual background of the case in enough detail to disclose whether its facts are sufficiently similar to those of a subsequent unrelated case to make our summary ruling applicable to the new case." *Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011).

[6] This "unique injury" approach seems akin to the "special injury" requirement under Delaware law. The Williamses' injuries here, while suffered on a large scale, do not appear to be truly "unique" in nature—shareholders other than plaintiffs who also retained stock experienced losses during the period specified in the complaint. And plaintiffs here aver that defendants' "false statements . . . directly induced" them to retain Citigroup shares. Am. Compl. ¶ 11.

among other things, that defendants misled them about the quality of the fund's investments. *Newman*, 530 F. App'x at 26–27. The *Newman* Court found that the misrepresentation claims must be brought derivatively. *Id.* at 27. It acknowledged that when a "claim for negligent misrepresentation against [a defendant] alleges fraudulent inducement, such a claim alleges 'injury other than that to the corporation' and may proceed directly." *Id.* at 27 n.1 (quoting *Big Lots*, 922 A.2d at 1177). A fraudulent inducement claim, however, may not encompass a holder claim; rather, it may require some affirmative action by the claimant, such as a purchase or sale.

In a second case decided by summary order, *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618 (2d Cir. 2012), we drew a distinction between a plaintiff's claim of being "induced . . . to invest" in a partnership,[7] which may be brought directly, and a claim "based on his decision to remain invested," which must be brought derivatively. *Id.* at 621. Stephenson was an investor in a Delaware limited partnership operating as a "feeder fund" into the Madoff Ponzi scheme. *Id.* at 620. He sued PricewaterhouseCoopers, LLP, the partnership's auditor, for fraud, and sought damages based on the loss of value

---

[7] "[U]nder Delaware law[,] the determination of whether a claim is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases." *Stephenson*, 482 F. App'x at 621 (alterations and internal quotation marks omitted).

of his partnership interest. We reasoned that holder claims, like the one alleged by the Williamses, involve no "harm" to an individual investor or partner that is distinct from the harm to other investors or partners. *Id.* at 621. Although it may offer insight, *Stephenson* is not dispositive with respect to the treatment of the Williamses' claim, however, because it—like *Newman*—is a summary order.

Although our Circuit's history implies a view that the Williamses' claims here and holder claims generally are properly brought derivatively under Delaware law, this implication arises entirely from our holdings in non-binding summary orders.[8] The Delaware Supreme Court, to our knowledge, has not yet evaluated whether the distinction between a holder claim and an inducement to purchase or sell claim is relevant (or dispositive) under *Tooley* and its progeny.

## IV. Certification

In sum, the seemingly various approaches taken by the Delaware state courts on the "direct versus derivative" question suggest a need for caution in

---

[8] We recently certified another question to the Delaware Supreme Court because of our uncertainty as to the applicability of *Tooley*. *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740 (2d Cir. 2014). The Delaware Supreme Court instructed us that, in its view, *Tooley* was inapposite to the facts of that case, in which the plaintiff sought to enforce its own contract with the defendant, to which the corporation was only a third-party beneficiary. *See NAF Holdings, LLC v. Li & Fung (Trading) Limited*, 118 A.3d 175, 176 (Del. 2015). The Delaware Supreme Court did not, however, elaborate upon the *Tooley* test further for cases, such as the one before us, in which it seems difficult to conclude that *Tooley* does not apply.

our resolution of this case. *Tooley* and its progeny may teach that a loss resulting from a deliberate decision not to sell stock, taken in reliance on the particularized statements of corporate officers, is a sufficiently "independent" injury to be brought as a direct rather than a derivative claim; but the opposite conclusion may also be drawn in light of the difficulty in separating the harm to the plaintiffs and the harm to the corporation.

As adverted to above, our Local Rules provide a means for us to certify a question of state law to the state's highest court if state law permits. *See* 2d Cir. Local R. 27.2(a). Delaware law allows this Court to certify questions of state law to the Delaware Supreme Court. Del. Sup. Ct. R. 41(a)(ii). That court is authorized to exercise its discretion to accept certified questions "where there exist important and urgent reasons for an immediate determination . . . of the questions certified," including a conflict among the state trial courts. Del. Sup. Ct. R. 41(b).

The issues we confront here seem particularly well suited to certification. First, despite the *Tooley* court's rejection of a "special injury" requirement for direct claims, some Delaware courts appear to have reinvigorated that doctrine by reference to *Tooley*'s requirement that a plaintiff's injury be "independent" of an injury to the corporation. Under Delaware's certification rules, that conflict

24

appears to serve as an appropriate basis for the Delaware Supreme Court to take up the certified question. Second, this case presents a question that "seems likely to recur and to have significance beyond the interests of the parties" in this lawsuit. *In re Motors Liquidation Co.*, 755 F. 3d 78, 86 (2d Cir. 2014) (alterations and internal quotation marks omitted), *certified question accepted*, 103 A.3d 1010 (Del. 2014). And finally, the factual setting for addressing the question presented is certain: It is set by the amended complaint. *See Espinoza v. Dimon*, No. 425, 2015 WL 5439176, at *1 (Del. Sept. 15, 2015).

## CONCLUSION

For the foregoing reasons, we respectfully CERTIFY the following question to the Delaware Supreme Court:

> Are the claims of a plaintiff against a corporate defendant alleging damages based on the plaintiff's continuing to hold the corporation's stock in reliance on the defendant's misstatements as the stock diminished in value properly brought as direct or derivative claims?

We invite the Delaware Supreme Court to expand, alter, or reformulate this question as it deems appropriate.

25

This panel will retain jurisdiction to decide the case once we have had the benefit of the views of the Delaware Supreme Court or once that Court declines to accept certification.[9]

---

[9] Defendants' motion for certification to the Delaware Supreme Court is **GRANTED** as to the question stated here.