# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CITIGROUP INC., CHARLES PRINCE, VIKRAM PANDIT, GARY CRITTENDEN, ROBERT RUBIN, ROBERT DRUSKIN, THOMAS G. MAHERAS, MICHAEL STUART KLEIN, and DAVID C. BUSHNELL, | § § § § § § § § | No. 641, 2015<br><br>Certification of Question of Law from the United States Court of Appeals for the Second Circuit |
| Defendants Below-Appellants, | § § § | C.A. Nos. 13-448-cv(L) and |
| v. | § § | 13-4504-cv(XAP) |
| AHW INVESTMENT PARTNERSHIP, MFS, INC., and ANGELA H. WILLIAMS, as Trustee of the Angela H. Williams Grantor Retained Annuity Trust UAD March 24, 2006, the Angela Williams Grantor Retained Annuity Trust UAD April 17, 2006, the Angela Williams Grantor Retained Annuity Trust UAD May 9, 2006, the Angela Williams Grantor Retained Annuity Trust UAD November 1, 2007, the Angela Williams Grantor Retained Annuity Trust UAD May 1, 2008, the Angela Williams Grantor Retained Annuity Trust UAD July 1, 2008, and the Angela Williams Grantor Retained Annuity Trust UAD November 21, 2008, | § § § § § § § § § § § § § § § § § § § § § § § § | |
| Plaintiffs Below-Appellees. | § | |

Submitted: April 27, 2016
Decided: May 24, 2016

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Certification of question of law from the United States Court of Appeals for the Second Circuit. Question answered.

Stephen P. Lamb, Esquire, Matthew D. Stachel, Esquire, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware; Brad S. Karp, Esquire, Walter Rieman, Esquire (*Argued*), Susanna M. Buergel, Esquire, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, for Appellants.

Kevin G. Abrams, Esquire, J. Peter Shindel, Jr., Esquire, Abrams & Bayliss LLP, Wilmington, Delaware; Steven F. Molo, Esquire, Robert K. Kry, Esquire, MoloLamken LLP, New York, New York; Jeffrey A. Lamken, Esquire (*Argued*), Hassan A. Shah, Esquire, MoloLamken LLP, Washington, D.C.; Jacob H. Zamansky, Esquire, Zamansky LLC, New York, New York, for Appellees.

Paul J. Lockwood, Esquire, Elisa M.C. Klein, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Jay B. Kasner, Esquire, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, *Amicus Curiae* for Securities Industry and Financial Markets Association.

Thad J. Bracegirdle, Esquire, Wilks, Lukoff & Bracegirdle, LLC, Wilmington, Delaware; Alan L. Rosca, Esquire, Colin R. Ray, Esquire, Peiffer Rosca Wolf Abdullah Carr & Kane, Cleveland, Ohio, *Amicus Curiae* for Public Investors Bar Association.

**STRINE**, Chief Justice:

The U.S. Court of Appeals for the Second Circuit has certified to this Court the following question of law arising from an appeal from a decision issued by the U.S. District Court for the Southern District of New York:

> Are the claims of a plaintiff against a corporate defendant alleging damages based on the plaintiff's continuing to hold the corporation's stock in reliance on the defendant's misstatements as the stock diminished in value properly brought as direct or derivative claims?[1]

The answer to that question, as explained below, is that the holder claims in this action are direct. This is because under the laws governing those claims—those of either New York or Florida—the claims belong to the stockholder who allegedly relied on the corporation's misstatements to her detriment. Under those state laws, the holder claims are not derivative because they are personal to the stockholder and do not belong to the corporation itself.

The familiar two-pronged test we articulated in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*[2] is not relevant to the analysis of whether the holder claims at issue here are direct or derivative. Rather, *Tooley* and its progeny deal with the narrow issue of whether a claim for breach of fiduciary duty or otherwise to enforce the corporation's own rights must be asserted derivatively or directly. Before evaluating a claim under *Tooley*, "a more important initial question has to be

---

[1] *AHW Inv. P'ship v. Citigroup, Inc.*, 806 F.3d 695, 705 (2d Cir. 2015).
[2] 845 A.2d 1031 (Del. 2004).

answered: does the plaintiff seek to bring a claim belonging to her personally or one belonging to the corporation itself?"[3] Because the holder claims at issue here belong to the holding stockholders under the state laws that govern the claims, and are not fiduciary duty claims or claims otherwise belonging to the corporation, *Tooley* does not affect our answer to this certified question.

## II.

In answering recent certifications of questions of law, we have explained the need for a certification to be accompanied by a stipulated set of facts.[4] In lieu of a stipulated set of facts, the Second Circuit explained that "the factual setting for addressing the question presented is certain: It is set by the amended complaint."[5] In some situations, we suppose that referring us to a complaint as the required factual context would be sufficient. Here, however, we note that our referring courts have struggled with defining the contours of the plaintiffs' claims. In fact,

---

[3] *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 180 (Del. 2015).

[4] *See Culverhouse v. Paulson & Co., Inc.*, 133 A.3d 195, 196 (Del. 2016) ("We reiterate the need for a stipulated set of facts to accompany certified questions of law to avoid confusion over disputed and undisputed facts."); *Espinoza v. Dimon*, 124 A.3d 33, 36 (Del. 2015) ("The Delaware Supreme Court rule that governs our consideration of certified questions of law is Rule 41. Because this tool can cause more harm than benefit if not used with precision, Rule 41(b) contemplates that a certification will pose a specific question of law, based on a stipulated set of facts. This approach allows us to focus on a relevant question of Delaware law against the backdrop of established facts, which are not the subject of dispute among the parties. The certification request before us is not tailored in that way. As a result, we will endeavor to be as helpful as we can be without risking giving overbroad and potentially misleading guidance because of the absence of stipulated facts, against which a precisely tailored question is framed." (citations omitted)); *see also* Supr. Ct. R. 41(b) ("A certification will not be accepted if facts material to the issue certified are in dispute.").

[5] *AHW Inv. P'ship*, 806 F.3d at 705.

2

the parties before us even disagree about the scope of the certified question and whether it encompasses not only a holder claim based on principles of common law fraud, but also a holder claim for negligent misrepresentation. Indeed, one of the parties offered to file additional papers regarding the claim—or claims, as they would have it—before us. We declined that invitation, as it hazards litigation over what should have been clearly settled by the parties before the referral to us. Likewise, much of the briefing before us by the defendants seems to be addressed to the subject of whether Delaware should say that no such thing as a holder claim exists.[6] The problem with that is, as we discuss below, that the District Court and the Second Circuit did not find, and the parties do not contend, that the plaintiffs' claims arise under the substantive law of Delaware.[7]

The extent of uncertainty about the nature of the claim—or claims—before us is inconsistent with the nature of the important, but carefully circumscribed role that we play under Article 4, § 11 of our Constitution.[8] The extent of disagreement between the parties about the scope of the question before us, and the underlying nature of the claims, highlights why a stipulation of facts is essential. Nevertheless, we wish to be as helpful as possible to our distinguished judicial

---

[6] *See, e.g.*, Opening Br. at 30–33.
[7] *See infra* note 62 and accompanying text.
[8] *See* Del. Const. art. IV, § 11.

colleagues and have done our best to isolate the undisputed parts of the record and use them to frame the issue before us as we best understand it.

But before we can answer the certified question, we need to identify what the plaintiffs' claims before us are and what they are not. This requires a deep exploration of the underlying record, and the back and forth between the parties before the District Court and Second Circuit.

**A.**

The plaintiffs are all affiliates of Arthur and Angela Williams, who owned stock in Citigroup. The defendants are Citigroup and eight of its officers and directors, which we collectively refer to for the sake of brevity as "Citigroup." The basic events leading to the Williamses' claims are as follows. In 1998, Citicorp and Travelers Group, Inc. merged, forming Citigroup. At that point, Arthur Williams's shares in Travelers Group were converted into 17.6 million shares of Citigroup common stock, which were valued at the time of the merger at $35 per share. In 2007, the Williamses had these shares transferred into AHW Investment Partnership, MFS Inc., and seven grantor-retained annuity trusts, all of which the Williamses controlled. For the sake of simplicity, we refer to the various related plaintiffs—including AHW, MFS, and the trusts—as "the Williamses."

According to the Williamses, they and their financial advisors developed a plan in May 2007 to sell their 17.6 million Citigroup shares. On May 17, 2007, the

4

Williamses sold one million shares at $55 per share. But, the Williamses halted their plan to sell all of their Citigroup stock because, based on Citigroup's filings and financial statements, they concluded that there was little downside to retaining their remaining 16.6 million shares. The Williamses allegedly held those shares for the next twenty-two months, finally selling them on March 18, 2009 for $3.09 per share, which is much less than $55 per share.

## B.

After selling their 16.6 million shares, the Williamses sued Citigroup in the U.S. District Court for the Southern District of New York. The theory of the Williamses' amended complaint is that their decision not to sell all of their shares in May 2007, and their similar decisions to hold on at least three later dates, were due to Citigroup's failure to disclose accurate information about its true financial condition from 2007 to 2009. Their complaint alleged:

> Had Williams received truthful and honest disclosures from Citigroup about the true state of its financial health, its subprime mortgage exposure and its related risks, he would have sold all of his shares in May 2007 at $55 per share and diversified into safer investments. . . . He also considered selling out his remaining 16.6 million shares on three other separate occasions—at $33 per share, $17.50 per share and $8.50 per share—in an effort to minimize his losses. He delayed doing so in continued reliance on the Company's misrepresentations and omissions.[9]

---

[9] App. to Opening Br. at 25 (Compl. ¶¶ 48–49).

5

The Williamses pled two counts: "negligent misrepresentation" and "common law fraud."[10] Although the Williamses filed their complaint in New York, they asserted that Florida law applied to both claims. In pleading the negligent misrepresentation theory, the Williamses alleged:

> *Defendants had a duty, as a result of a special relationship, i.e., the issuer of shares to public investors, to give accurate information. . . . Defendants occupied a special position of confidence and trust such that Plaintiffs' reliance on their public statements was justified.* Put another way, Defendants had a duty to speak with care in these circumstances, where the relationship is such that in morals and good conscience Plaintiffs had the right to rely on Defendants for information. Defendants made multiple false representations that they should have known were incorrect. Defendants knew that Plaintiffs desired the information supplied in the representations for a specific purpose, *i.e.*, to decide whether to hold or sell their shares in Citigroup.[11]

As to the common law fraud count, the Williamses alleged:

> Plaintiffs were personally defrauded by Citigroup, as that cause of action is delineated by the common law in the State of Florida. Plaintiffs were the recipients of multiple misrepresentations and omissions of material fact. Defendants knew that their statements to Plaintiffs concerning Citigroup's subprime exposure were false at the time they were made. . . . Defendants knowingly made multiple misrepresentations and omissions of material fact . . . for the purpose of inducing [the Williamses] to hold their Citigroup shares, which they in fact did.[12]

For both the negligent misrepresentation and common law fraud claims, the Williamses' theory of damages is identical. The Williamses alleged that had

---

[10] *See id.* at 83, 92 (Compl. at 72, 81).
[11] *Id.* at 83–84 (Compl. ¶¶254–62) (emphasis added).
[12] *Id.* at 93 (Compl. ¶¶ 290–94).

6

Citigroup informed the market in real time of the deepening problems at Citigroup, the Williamses would have acted on those disclosures and sold all 17.6 million of their shares at $55 on May 17, 2007. Because they, however, allegedly relied on the disclosures, the Williamses say that they held 16.6 million of their shares until March 2009—a time when the severe depth of Citigroup's subprime mortgage exposure was fully evident—and therefore sold those shares at $3.09. Thus, they seek $809,950,000, or the difference between what they otherwise would have received for each share they held and the $3.09 they collected.[13] Alternatively, the Williamses demand $532,897,000, which is based on the $35 value of Citigroup shares at the time of the 1997 merger.[14]

## C.

Citigroup moved to dismiss under Federal Rule 12(b)(6), arguing that (1) the Williamses lack standing because their claims are derivative; and (2) New York law, not Florida law, applied. On October 13, 2013, the District Court granted Citigroup's motion and dismissed the amended complaint.

In its decision, the District Court did not begin by analyzing the nature of the Williamses' claims or discussing whether the claims were ones that belonged to the Williamses—as the holding stockholders—or somehow Citigroup as the issuer. Instead, the District Court first analyzed whether the Williamses' claims are direct

---

[13] *See id.* at 55–56 (Compl. ¶¶ 171–72).
[14] *See id.* at 56 (Compl. ¶ 173).

or derivative without any consideration of that predicate issue.[15]  It reasoned "that Delaware law determines whether claims against Citigroup are direct or derivative because Citigroup is incorporated in Delaware."[16]  The court then concluded that the Williamses' claims are direct under *Tooley* because (1) the Williamses "'can prevail without showing an injury to' Citigroup because the nature of the allegation is that the misstatements and omissions concealed damage to Citigroup's assets that had already been done"; and (2) "any remedy will go directly to [the Williamses], not to Citigroup."[17]

It was only after the District Court determined that the Williamses' claims were direct that it then went on to decide what state's substantive law governed their claims and whether those claims survived Citigroup's Rule 12(b)(6) motion. The District Court ultimately determined that New York substantive law applied to the Williamses' claims because New York had a greater interest in the case than Florida.[18]  In the course of this analysis, the District Court summarily analyzed the amended complaint's negligent misrepresentation count as a run-of-the-mill claim under state common law.[19]  The District Court apparently did not find that the fact that the Williamses' damages theory was based on a holder theory posed any special difficulties.  The District Court then dismissed the Williamses' negligent

---

[15] *See AHW Inv. P'ship v. Citigroup, Inc.*, 980 F. Supp. 2d 510, 516–18 (S.D.N.Y. 2013).
[16] *Id.* at 516.
[17] *Id.* at 517.
[18] *See id.* at 522–24.
[19] *See id.* at 519.

misrepresentation claim, noting that "New York law requires 'the existence of a special privity-like relationship' between the plaintiff and defendant for a successful negligent misrepresentation claim,"[20] and reasoning that "because Citigroup is an issuer of shares to public investors, defendants are not in a special privity-like relationship with the investing public, or with actual purchasers."[21]

Although the District Court did not construe the negligent misrepresentation count as a holder claim, the court referred to the common law fraud count explicitly as a "holder claim."[22] In addressing this reality, the District Court focused on the less-than-universal acceptance of common law fraud based on a theory that a stockholder held, rather than purchased, stock in a corporation: "The parties agree that the basic elements of common law fraud in New York and Florida are substantially equivalent [and] agree that the states differ in their treatment of holder claims."[23] The District Court compared New York and Florida law on holder claims, foregoing any discussion of the more typical common law fraud elements.[24] The court then dismissed the common law fraud claim, reasoning that it is "impermissibly speculative" because the Williamses "do not allege how long thereafter Williams cancelled the remaining sales, nor when he

---

[20] *Id.* at 524 (quoting *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1109 (N.Y. 2011)).
[21] *Id.*
[22] *Id.* at 519.
[23] *Id.*
[24] *See id.* at 519–21.

9

had planned to execute the sales before the alleged misstatements caused him to reverse course."[25] The District Court also observed that the Williamses "claim as damages the difference between the price they estimate would have prevailed on May 17, 2007 and the price they received in March 2009. And yet, by [the Williamses'] own telling, they would have sold the 16.6 million shares at issue here at some point after May 17, 2007."[26] Finally, the District Court noted that New York precedent prohibits the court from hypothesizing about whether the Williamses would have sold their Citigroup shares absent the alleged misrepresentation.[27]

**D.**

The Williamses appealed, arguing "that the District Court erred by applying New York, not Florida, law to their claims, and that, even applying New York law, their fraud and negligent misrepresentation claims were sufficient to withstand a motion to dismiss."[28] Citigroup cross-appealed, asserting that the trial court erred because the Williamses' "claims are properly considered derivative rather than direct."[29] Rather than decide whether the District Court properly determined that

---

[25] *Id.* at 526 (internal quotation marks omitted).
[26] *Id.* (internal citation omitted).
[27] *See id.*
[28] *AHW Inv. P'ship*, 806 F.3d at 699.
[29] *Id.*; *see also id.* at 697 ("Defendants cross-appeal, arguing that the District Court erred by addressing the adequacy of plaintiffs' substantive claims as 'holders' of the shares during a period of decline in share value: According to defendants, Delaware law mandates that such

10

New York substantive law applied to the Williamses' claims, the Second Circuit focused on the cross-appeal, reasoning that "[i]f we accept defendants' argument, then the District Court lacked jurisdiction to adjudicate the sufficiency of plaintiffs' claims, and we must affirm the dismissal of the amended complaint without further considering plaintiffs' claims. The lack of prudential standing would present an independent basis for dismissing the complaint."[30]

Then, like the District Court had, the Second Circuit decided that *Tooley* might determine whether the Williamses' claims were derivative before discussing the nature of the claims or whether the claims could possibly belong to Citigroup. The Second Circuit agreed with the District Court that Delaware law governs whether the claims were direct or derivative because Citigroup is incorporated in Delaware: "Under New York law, we look to the law of the state of incorporation when adjudicating whether a claim is direct or derivative. Because Citigroup is incorporated in Delaware, Delaware law controls whether plaintiffs' claims are properly characterized as direct or derivative."[31] The Second Circuit also agreed with the trial court that "*Tooley* suggests that the Williamses have stated direct claims."[32] But, the Second Circuit explained that "[s]ubsequent developments in the Delaware courts' application of *Tooley* give us pause" and "suggest that the

claims be brought in a shareholder derivative action, not as direct claims (as plaintiffs have done).").

[30] *Id.* at 699 (citation omitted).

[31] *Id.* (citations omitted).

[32] *Id.* at 701.

11

two-part *Tooley* test may now have evolved and that the Williamses' claims . . . might not be correctly treated as direct under Delaware law."[33] Because of this apparent confusion, the Second Circuit sought our guidance as to whether what it called a "holder claim" is direct or derivative.[34]

The Second Circuit then briefly discussed the nature of the Williamses' claims. Like the District Court, the Second Circuit recognized that the Williamses pled counts of negligent misrepresentation and common law fraud.[35] But, the Second Circuit classified the Williamses' claims—without distinguishing between those for negligent misrepresentation and common law fraud—as "holder claims" because those claims "alleg[e] harm based on the retention of stock in reliance on a defendant's statements."[36] That is, although the District Court appeared to treat only the common law fraud claim as a holder claim and not the negligent misrepresentation claim, the Second Circuit deemed both to be holder claims because the Williamses' damages theory for both claims was identical, and was based on the alleged decision to hold the stock in reasonable reliance on Citigroup's public disclosures.

The parties themselves have dickered over whether the "claims" referred to in the question certified to us encompass both the negligent misrepresentation and

---

[33] *Id.*; *see also id.* at 703 ("Delaware cases post-*Tooley* complicate our analysis and suggest that the Williamses may lack standing to pursue their claims against defendants.").

[34] *Id.*

[35] *See id.* at 698.

[36] *Id.* at 703 (emphasis omitted).

12

common law fraud theories. Because the question uses the plural and both claims are holder claims,[37] we read the question as referring to both of the Williamses' claims. Thus, we refer to the Williamses' negligent misrepresentation and common law fraud claims as their "Holder Claims."

**E.**

We empathize with the struggle our federal judicial colleagues have had with the Williamses' claims. At one mundane level, that of definition, a holder claim seems simple enough: "a cause of action by persons wrongfully induced to *hold* stock instead of selling it."[38] But, our referring courts' struggle to identify the precise nature of the Williamses' claims is not surprising given the lack of uniform recognition of holder claims,[39] and more specific to this case, the Williamses' shifting attempts at clarifying their claims, which have continued during this appeal. A reading of the amended complaint and our referring courts' opinions,

---

[37] *See supra* note 1 and accompanying text.

[38] *Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1256 (Cal. 2003) (emphasis in original); *see also Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 926 (Tex. 2010) ("In a 'holder' claim, the plaintiff alleges not that the defendant wrongfully induced the plaintiff to purchase or sell stock, but that the defendant wrongfully induced the plaintiff to continue holding his stock. As a result, the plaintiff seeks damages for the diminished value of the stock, or the value of a forfeited opportunity, allegedly caused by the defendant's misrepresentations."); Lauren A. Demanovich, *Holding Out for a Change: Why North Carolina Should Permit Holder Claims*, 92 N.C. L. Rev. 988, 992 (2014) ("A holder claim is a suit brought for damages based on the fact that an individual shareholder suffered financial loss after retaining stock for longer than he or she otherwise would have as a consequence of an officer's or director's misrepresentation.").

[39] *See Grant Thornton*, 314 S.W.3d at 927–28 ("[A] number of courts have rejected [holder] claims. Conversely, courts in several states (including California, Massachusetts, New Jersey, and New York) have recognized holder claims." (citations omitted)); Demanovich, *supra* note 38, at 999–1005 (surveying the controversial status of holder claims in various states).

which do not reference state securities laws, indicates that the Williamses originally framed their claims as Florida common law claims. Then, in their brief to us, the Williamses couched their Holder Claims as state securities law claims, which is how holder claims have often been treated.[40] A holder claim could theoretically be implied under New York's Martin Act[41] or the Florida Securities and Investor Protection Act,[42] and the Williamses' brief explains that "[w]hether to allow holder claims is a question of substantive state securities law,"[43] and that they "are pursuing tort claims for securities fraud."[44] At oral argument, however, the Williamses retreated from this position, asserting once again that they "are relying on actually, in fact, just common law fraud—the standard fraud under the Restatement."[45]

A certified question of the kind we have accepted is not a proper vehicle in which to explore what the claims in the underlying action are. That sort of

---

[40] *See, e.g.*, CONSTANCE E. BAGLEY, MANAGERS AND THE LEGAL ENVIRONMENT: STRATEGIES FOR THE 21ST CENTURY 693 (8th ed. 2016) ("Certain states, under their blue sky laws, permit so-called holder claims by investors who allege that they did not sell their securities because of the defendant's fraud." (emphasis omitted)); Eric L. Talley, *Cataclysmic Liability Risk Among Big Four Auditors*, 106 COLUM. L. REV. 1641, 1668 (2006) (explaining that holder claims are a type of state securities law claim); Demanovich, *supra* note 38, at 997 (same).

[41] *See* N.Y. General Business Law §§ 352–53 (McKinney 2016).

[42] *See* Fla. Stat. §517.301 (2016).

[43] Answering Br. at 2.

[44] *Id.* at 25; *see also id.* at 14 ("It cannot be that, when a corporation defrauds a shareholder, the only remedy is a derivative suit in which the corporation keeps any recovery. That 'remedy' is no remedy at all: It would effectively eliminate *this category of securities fraud claims* altogether." (emphasis added)).

[45] Video: Oral Argument before the Delaware Supreme Court, at 30:45 (*Citigroup v. AHW Investment*, No. 641, 2015, Apr. 27, 2016), *archived at* http://livestream.com/Delaware SupremeCourt/events/5272320/videos/121185340 [hereinafter "Oral Argument at __"].

fundamental issue should ordinarily be agreed to by the parties and stipulated to in the stipulation of facts upon which we are to base our answer to the certified question. Consistent with our desire to be helpful, however, we will set forth what we understand to be the nature of the Williamses' Holder Claims, and how that bears on our answer to the question we have been asked.

We start with noting that the reductive term "holder claims" was reasonably used by the Second Circuit because the Williamses' negligent misrepresentation and common law fraud claims have identical elements, but for one element that is irrelevant to whether their claims are fundamentally based on their alleged decision to hold stock in reliance on the defendants' alleged failure to make timely disclosures necessary to ensure that Citigroup's public disclosures about its condition were materially accurate. That element is an important one—whether the defendants had to act with scienter or merely with a lack of reasonable care[46]— but it does not change the cause of action from one that would colloquially be regarded by a securities lawyer as a holder claim. A holder claim based on a negligent misrepresentation claim is simply easier for a plaintiff to prove, because

---

[46] *See Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 762 (Del. Ch. 2014) ("[N]egligent misrepresentation is essentially a species of common law fraud with a lesser state of mind requirement—*i.e.*, scienter is replaced with negligence."); *see also* 37 C.J.S. *Fraud* § 75 (Westlaw 2016) ("The tort of negligent misrepresentation does not require scienter or an intent to defraud; it is not necessary to show that the defendant had any intent to deceive the victim, and that he or she generally did not demonstrably know that what he or she said was false.").

15

that plaintiff, unlike a plaintiff bringing a holder claim under a common law fraud theory, need not prove scienter.

This is not to say that this distinction does not potentially have important implications for cases like these. We are troubled by the shifting nature of the Williamses' approach to their negligent misrepresentation claim for a reason that relates to, but is somewhat differently grounded than, our referring courts' concern whether the holder claims are direct or derivative. Our referring courts wanted to make sure that the Williamses were not asserting a claim that belonged to Citigroup rather than themselves personally, and were not thereby intruding on the Citigroup board's ability to control its own legal causes of action. But, the Williamses' Holder Claims raise another sensitive concern: Whether their claims are ones that under the internal affairs doctrine are governed by Delaware law, and not the law of any other state.

The Williamses have been hard to pin down on the nature of what they are alleging. As to their negligent misrepresentation claim, the Williamses alleged in their complaint that the scienter requirement of common law fraud was inapplicable because the Citigroup's officers and directors had "a duty of candor" to the Williamses because of their special relationship with Citigroup's stockholders.[47] Then, in their briefs to us, the Williamses went out of their way to

---

[47] *See* App. to Opening Br. at 83 (Compl. ¶ 256).

16

distance themselves from any hint that their negligent misrepresentation claim was based on the fiduciary relationship that exists between a corporation's managers and its investors. To do that, the Williamses stated that they "are not pursuing claims for breach of fiduciary duty,"[48] and that "[w]hether Citigroup's officers breached fiduciary duties to the company is totally irrelevant to the harm the Williamses suffered."[49] And at oral argument, the parties agreed that no breach of fiduciary duty claim is at issue.[50]

Consistent with their approach before us, in oral argument, the Williamses argued that Florida law governed their claim for negligent misrepresentation and that Florida law allows a wide-open cause of action on any speaker for negligent misrepresentation, regardless of any special relationship of trust between the speaker and the plaintiff. This, of course, is more than a tad in tension with their prior arguments before our referring courts. Whatever one would ultimately see after piercing this fog, we note the following: If the Williamses were asserting a holder claim in which they were alleging that Citigroup's officers and directors

---

[48] Answering Br. at 25.

[49] *Id.* at 15; *see also id.* at 16 ("The harm the Williamses suffered was Citigroup's violation of that tort-law duty. That harm is separate from any injury Citigroup may have suffered from fiduciary breaches by its managers."); *id.* at 16 n.1 ("That reasoning applies *a fortiori* in a case like this, where plaintiffs are asserting, not a breach of fiduciary duty, but garden-variety tort claims for securities fraud.").

[50] *See* Oral Argument at 10:20 ("Now these claims of course could have been brought as breach of fiduciary duty claims. As a pleading matter, they were brought as fraud claims or negligent misrepresentation claims."); *id.* at 28:12 (acknowledging that the Williamses disavowed any reliance on a fiduciary-based theory and "are proceeding under common law fraud and common law misrepresentation").

were their fiduciaries and owed them a heightened duty, that claim would be an internal affairs claim for breach of fiduciary duty. In that case, under the Commerce Clause[51] and the Full Faith and Credit Clause,[52] Delaware law would apply to the merits and we would have to decide whether that holder claim was cognizable at all and, if so, whether it was derivative or not.[53] Likewise, any argument—such as the one the Williamses made explicitly in the amended complaint—that an issuer of stock owes special duties to the holders of its stock is just another way of arguing that the investors in a corporation are owed fiduciary duties by those who manage it. In other words, it is a way of saying that because of the relationship between the governed and the governors of a corporation, a special cause of action ought to exist. That kind of claim is governed by the laws of the state of incorporation exclusively under the internal affairs doctrine.[54]

Furthermore, the way that the Williamses have pled both the negligent misrepresentation and common law fraud claims is troubling for another reason

---

[51] U.S. Const. art. I, § 8.
[52] *Id.* art. IV, § 1.
[53] *See McDermott Inc. v. Lewis*, 531 A.2d 206, 216–17 (Del. 1987) (explaining the relationship between the internal affairs doctrine and the Commerce Clause and the Full Faith and Credit Clause); *Rosenmiller v. Bordes*, 607 A.2d 465, 468 (Del. Ch. 1991) ("The internal affairs doctrine requires that the state that has created the corporation be the only state whose law controls the relationships among the corporate entity, directors, officers and stockholders. This concept implicates federal due process, commerce clause and full faith and credit clause considerations because in the absence of such a rule, a corporation would be subject to the risk of inconsistent judgments by virtue of its being amenable to service of process in different jurisdictions."); *see also VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1112–13 (Del. 2005).
[54] *See VantagePoint*, 871 A.2d at 1112–13.

18

that bears on whether the internal affairs doctrine might govern their claims. That is that the Williamses have not sued only Citigroup. They have also sued its officers and directors, as if this were a claim for breach of fiduciary duty. On this limited record and without focus on this issue from the parties, we are loath to say more. But, we do think it is important to note that the Williamses' complaint contained no claim for veil-piercing, and it seems, shall we say, improbable to think that Citigroup would be a good candidate for veil-piercing. In discussing holder claims, the U.S. Supreme Court has explained "that a misrepresentation which leads to a refusal to purchase or to sell is actionable in just the same way as a misrepresentation which leads to the consummation of a purchase or sale."[55] Why is it, then, that the Williamses have sued the directors and officers of Citigroup when the corporation itself is the typical defendant in a securities fraud claim regarding the purchase or sale of securities,[56] such as an implied cause of action under SEC Rule 10b-5?[57] After all, a common situation when federal claims

---

[55] *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 744 (1975); *see also infra* notes 76–79 and accompanying text.

[56] *See In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 451 (S.D.N.Y. 2009) ("The typical defendant in a Section 10b-5 or other Exchange Act case is a corporation.").

[57] *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142–43 (2011) ("For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person

19

under Rule 10b-5 are filed is for parallel derivative actions to be filed.[58] The theory of those actions is normally that if the corporation is liable to the class in the 10b-5 action, then the directors and officers are liable for breach of fiduciary duty in causing the corporation to make false and misleading disclosures, and should make the corporation whole for any damages it must pay to the class in the 10b-5 action. This is not a situation where the Williamses had face-to-face negotiations with any Citigroup director or officer, who said something directly to them.[59] Rather, the Williamses are suing over the failure of Citigroup itself to make timely and materially accurate public disclosures. When one considers this reality along

---

who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said."); *City of Pontiac Policemen's and Fireman's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 n.53 (2d Cir. 2014) (affirming District Court's dismissal of individual defendants "on the grounds that under *Janus*, the individual defendants . . . must have actually made the statements . . . to be held liable under Section 10(b)" (internal citation omitted) (internal quotation marks omitted)); *Fezzani v. Bear, Stearns & Co. Inc.*, 716 F.3d 18, 25 (2d Cir. 2013) ("Under . . . *Janus*, only the person who communicates the misrepresentation is liable in private actions under Section 10(b)." (internal citation omitted)); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166 (S.D.N.Y. 2012) (explaining that for purposes of determining the proper defendants for 10(b)-5 purposes, "[a]s a general matter, 'officer or director status alone does not constitute control'" (quoting *In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005))); *In re Coinstar Inc. Sec. Litig.*, 2011 WL 4712206, at *10 (W.D. Wash. Oct. 6, 2011) (dismissing 10(b)-5 claim against corporation's directors under *Janus* because they did not "ultimately ha[ve] authority over a false statement or omission"); *see also* 5 BROMBERG & LOWENFELS ON SEC. FRAUD § 7:306.55 (2d ed. 2015) (compiling additional cases that used *Janus* as a means of shielding directors from liability under Rule 10b-5).

[58] *See* 6 BROMBERG & LOWENFELS ON SEC. FRAUD § 8:12 (2d ed. 2015) (recognizing that there are often state law cases that accompany 10b-5 claims in federal court); 69A AM. JUR. 2D *Sec. Regulation* § 1019 (Westlaw 2016) (same).

[59] The Williamses do allege that their so-called "Financial Advisors" had some meetings with unidentified senior officers at Citigroup. *See* App. to Opening Br. at 61 (Compl. ¶ 188). This thin gruel does not sustain any personal claim of fraud under traditional principles, and there is no indication that any meetings were in any way intended to influence buy and sell decisions by the Williamses.

20

with the Williamses' earlier attempts to base a scienter-free claim against directors and officers on the grounds that the issuer of securities owes special duties to its investors, there emerges a concern that the Williamses are pressing a cause of action that, if viable, has to be governed by the laws of the state in which Citigroup is incorporated.

A related concern arises from state law holder claims more generally. When a public corporation such as Citigroup has shares in the market, it will have investors from all around the world, and certainly in virtually every state in our nation. For investors to be able to sue not only under federal law, but purport to sue under their own state's bespoke laws, subjects corporations to potential inconsistencies, inefficiencies, and unfairness. This is another issue we do not delve into, but given the Williamses' attempt to subject Citigroup, a Delaware corporation with its shares listed on the New York Stock Exchange, to claims under Florida law because they assert that Florida law allows for a recovery without any need to prove scienter, we note this as another concern raised if state law holder claims are broadly recognized.

Of course, there are other ways in which a state other than the state of incorporation could create a cause of action that would intrude on the important

21

space that must be exclusively occupied by the state of incorporation.[60] For example, at oral argument, counsel for Citigroup suggested that a state could create a cause of action allowing a group of stockholders to sue and recover damages for the harm to the corporation from mismanagement that was not disclosed. If a cause of action were created that involved having damages belonging to the corporation—because that sort of breach of fiduciary duty claim would ordinarily belong to the harmed corporation itself—awarded to a class of stockholders, that would be problematic, not only because it would usurp the corporation's own claim, but because it would usurp the state of incorporation's exclusive right to govern the internal affairs of the corporation. But, the certified question before us asks only about holder claims, which are not of that kind. Rather, the Williamses here seek damages on a theory that is the obverse of a typical securities purchaser claim. Whether or not this sort of a holder claim should be cognizable is a separate question from whether it is one that could ever plausibly be said to belong to the issuer rather than the holder.

The defendants have asked us to delve into the first issue even though that is not posed in the narrow question put to us. We will not be tempted by them into overstepping our bounds. Our answer to this certified question does not signal our

---

[60] *See Rosenmiller*, 607 A.2d at 468 ("It is well settled that, under the internal affairs doctrine, the state of incorporation has the paramount interest in having disputes of internal corporate governance resolved according to its own laws.").

22

view as to whether states should recognize a holder claim such as those at issue here, as either a matter of statutory or common law. Our opinion about that topic—which is an important and difficult one given the numerous policy and proof problems raised by holder claims—has not been sought and is not necessary to answer the question we have been asked.[61]

For the purpose of answering this certified question, what matters is that the Williamses' Holder Claims are governed by either New York or Florida law—a fact about which the parties, and as important, our referring courts, agree[62]—and that although neither the Florida Supreme Court nor the New York Court of Appeals have addressed whether holder claims are permitted under their respective states' law,[63] other courts in those states have suggested that their highest courts would recognize holder claims[64] and would conclude, consistent with their very

---

[61] *See Chaplake Holdings, LTD. v. Chrysler Corp.*, 766 A.2d 1, 4–5 (Del. 2001) (explaining that we address only the question presented in the certified question).

[62] *See AHW Inv. P'ship*, 806 F.3d at 698–99; *AHW Inv. P'ship*, 980 F. Supp. 2d at 514; Opening Br. at 13; Answering Br. at 10.

[63] *See AHW Inv. P'ship*, 980 F. Supp. 2d at 519–20 (reviewing decisions from the Florida District Court of Appeal and the U.S. District Court for the Northern District of Florida, and "predict[ing] that Florida would adopt California's approach to recognizing holder claims" subject to "heightened pleading standards"); *id.* at 520–21 (reviewing decision from the New York Appellate Division—which "has significantly narrowed the scope of cognizable damages for holder claims" by imposing strict limitations specific to holder claims—and reasoning that "New York's appellate courts are the best predictors of how the New York Court of Appeals would decide such a contentious issue").

[64] *See Mantana v. Merkin*, 989 F. Supp. 2d 313, 323–24 (S.D.N.Y. 2013) ("[T]his Court cannot predict that the New York Court of Appeals would preclude holder claims altogether. No New York state court has so held, or even so stated in dicta. The Court instead is compelled to predict . . . that the New York Court Appeals today would still recognize a limited set of holder claims . . . ."); *Rogers v. Cisco Sys., Inc.*, 268 F. Supp. 2d 1305, 1313 (N.D. Fla. 2003)

23

name, that if such claims are cognizable, they belong to the holder and that the primary defendant would be the issuer corporation.[65] There is no hint in the authorities cited that a holder claim could somehow belong to the issuer corporation itself. Having done our best to understand the nature of the Holder Claims at issue, we now answer the specific question posed to us.

## III.

The answer to the certified question that we have accepted from the Second Circuit is that the Williamses may assert their Holder Claims against Citigroup directly if those claims are otherwise cognizable. But, this is not an answer we reach by analyzing such a claim under the two-part test established in *Tooley* and applied in later cases. Rather, the Holder Claims are direct claims because they belong to the holders and are ones that only the holders can assert, not claims that could plausibly belong to the issuer corporation, Citigroup.

---

(reasoning that because Florida has adopted provisions of the Restatement (Second) of Torts, Florida courts would likely recognize holder claims).

[65] *See Starr Found. v. Am. Int'l Grp., Inc.*, 901 N.Y.S.2d 246, 251–52 (N.Y. App. Div. 2010) (explaining that a holder claim is asserted by a stockholder who allegedly relied on the misrepresentations to its detriment, and that damages are specific to that plaintiff's reliance); *Rogers*, 268 F. Supp. 2d at 1314 (explaining that Florida courts would require specific allegations of reliance in a complaint asserting a holder claim because those claims are specific to the plaintiff asserting them); *see also Grant Thornton*, 314 S.W.3d at 930 (concluding that under Texas law, "holder claims, to the extent they are viable, must involve a direct communication between the plaintiff and the defendant").

24

As this Court and the Court of Chancery have explained, determining whether a claim is direct or derivative depends on the nature of the claim itself.[66] In *NAF Holdings, LLC v. Li & Fung (Trading) Limited*,[67] a case in the commercial contract context, we explained that "[t]he case law under *Tooley* . . . and its progeny deal with the distinct question of when a cause of action for breach of fiduciary duty or to enforce rights belonging to the corporation itself must be asserted derivatively."[68] We then elaborated:

> *Tooley* and its progeny do not, and were never intended to, subject commercial contract actions to a derivative suit requirement. That body of case law was intended to deal with a different subject: determining the line between direct actions for breach of fiduciary duty suits by stockholders and derivative actions for breach of fiduciary duty suits subject to the demand excusal rules set forth in § 327 of the Delaware General Corporation Law, Court of Chancery Rule 23.1, and related case law.[69]

---

[66] *See, e.g.*, *Agostino v. Hicks*, 845 A.2d 1110, 1122 n.54 (Del. Ch. Mar. 11, 2004) ("Since the fiduciary duty of officers and directors runs to the corporation and the shareholder, the shareholder will always be able to assert a breach of duty owed to it, but plainly not all fiduciary duty claims are individual claims. As such, in the context of fiduciary duty claims, the focus should be on the nature of the injury. In other contexts, the focus upon to whom the relevant duty is owed will allow the segregation of derivative claims." (internal citation omitted)); *see also Tooley*, 845 A.2d at 1036 (explaining that *Agostino* followed the proper inquiry for determining whether a claim is direct or derivative "[i]n the context of a claim for breach of fiduciary duty"); *Allen v. El Paso Pipeline GP Co, L.L.C.*, 90 A.3d 1097, 1104 (Del. Ch. 2014); *supra* note 70 and accompanying text.

[67] 118 A.3d 175.

[68] *Id.* at 176; *see also Agostino*, 845 A.2d at 1122 ("In other words, the inquiry should focus on whether an injury is suffered by the shareholder that is not dependent on a prior injury to the corporation. In the context of a complaint asserting breaches of fiduciary duty—duty that under Delaware law runs to the corporation *and* the shareholder—the test may be stated as follows: Looking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?" (emphasis in original)).

[69] *NAF Holdings*, 118 A.3d at 179; *see also Tooley*, 845 A.2d at 1036 ("*In the context of a claim for breach of fiduciary duty*, the Chancellor articulated the inquiry as follows: 'Looking at the

After explaining that *Tooley* was designed for determining whether fiduciary duty claims are direct or derivative, we rejected the defendant's assertion that *Tooley* was "intended to be a general statement requiring all claims, whether based on a tort, contract, or statutory cause of action . . . , to be brought derivatively whenever the corporation of which the plaintiff is a stockholder suffered the alleged harm."[70]

body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?'" (quoting *Agostino*, 2004 WL 443987, at \*7) (emphasis added)); *In re El Paso Pipeline Partners, L.P.,* 132 A.3d 67, 99 (Del. Ch. 2015) ("[T]he two-part test that the Delaware Supreme Court created in *Tooley* does not apply to contract rights. It deals with a different subject: 'determining the line between direct actions for breach of fiduciary duty suits by stockholders and derivative actions for breach of fiduciary duty suits subject to demand excusal.' This case did not involve any claims for breach of fiduciary duty, the Post-Trial Opinion did not address breaches of fiduciary duty, and the Liability Award does not rest on a breach of fiduciary duty." (quoting *NAF Holdings*, 118 A.3d at 179) (internal citation omitted)); *Allen*, 90 A.3d at 1105 ("Pre-*Tooley* cases recognized that a stockholder could assert a direct claim if the cause of action involved 'a contractual right of shareholders that is independent of the corporation's rights.' . . . *Tooley* did not overrule these cases or alter the longstanding principle that a stockholder suffers injury when its contractual rights are breached." (internal citation omitted)); *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740, 745 (2d Cir. 2014) (noting that "each of the many precedents of shareholder litigation that the *Tooley* opinion reviewed was also based on an allegation of breach of a fiduciary (or other similar) duty implied in law arising from the status of the defendant in relation to the corporation" and that "each of the subsequent cases in which the Delaware Supreme Court has cited *Tooley* has also involved similar claims of breach of fiduciary (or like) duties"); DEBORAH A. DEMOTT & DAVID F. CAVERS, SHAREHOLDER DERIVATIVE ACTIONS: LAW AND PRACTICE § 2.3 (2015) ("Influential though *Tooley* has been, its scope of applicability is also significant." (citing *NAF Holdings*, 118 A.3d 175)); *Corporate Litigation/Breach of Contract/Shareholder Litigation*, 27 BUS. TORTS REP. 82 (2015) ("*Tooley*— and the prior cases discussed therein by the Delaware Supreme Court on the subject of derivative versus direct claims—dealt solely with alleged fiduciary breaches by defendant boards.").

[70] *NAF Holdings*, 118 A.3d at 180; *see also id.* ("Reading *Tooley* to convert direct claims belonging to a plaintiff into something belonging to another party would, we confess, be alien to our understanding of what was at stake in that case, or in the cases after *Tooley* that relied on it."); *In re El Paso*, 132 A.3d at 86 ("[T]he General Partner errs by treating *Tooley* as if its holding required all claims, whether sounding in tort, contract, or a statutory cause of action, to be brought derivatively whenever an entity in which the plaintiff is an investor can be said to have suffered harm such that some component of the plaintiff's loss could be framed as having been suffered indirectly. . . . [T]hat position overstates *Tooley*'s reach.").

We take this opportunity to reaffirm our explanation in *NAF Holdings* of *Tooley*'s limited scope.

Just as a *Tooley* analysis was not needed to determine whether the commercial-contract claim in *NAF Holdings* was direct or derivative, it does not apply here. Because directors owe fiduciary duties to the corporation and its stockholders,[71] there must be some way of determining whether stockholders can bring a claim for breach of fiduciary duty directly, or whether a particular fiduciary duty claim must be brought derivatively on the corporation's behalf. We established *Tooley*'s two-pronged test as a means of determining whether such claims are direct or derivative.[72]

But, as we explained in *NAF Holdings*, when a plaintiff asserts a claim based on the plaintiff's own right, such as a claim for breach of a commercial contract, *Tooley* does not apply.[73] Here, the Williamses were the holders of Citigroup stock. Citigroup itself is not a holder, and at oral argument Citigroup's counsel was unable to identify any authority in New York or Florida law that would suggest that the issuer of stock should be the plaintiff in a holder claim lawsuit. Nor do the amended complaint or our referring courts' decisions suggest that is the case. That the holder claims under both New York and Florida law belong to the holder, not

---

[71] *See Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989); *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984); *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939).

[72] *See supra* note 68 and accompanying text.

[73] *See supra* notes 67–70 and accompanying text.

the issuer, alone is enough to make the Williamses' Holder Claims direct.[74]

Delaware law cannot convert a direct claim that another state's law has granted to securities holders by deciding that it actually belongs to the corporation that the securities holder is suing. Thus, because the Holder Claims here could not possibly belong to the corporation, Delaware law has nothing to do with what type of claims the Williamses are asserting.[75] Their Holder Claims are direct, but a court need not engage in a *Tooley* analysis to arrive at that result.

Finally, whatever analytical problems are involved in recognizing the Holder Claims as a species of common law fraud claim or negligent misrepresentation claim do not turn those Holder Claims into claims belonging to the issuer who is the primary defendant, or into claims governed by the internal affairs doctrine. As discussed above, holder claims are analytically indistinct from seller and purchaser

---

[74] Further, the alleged harm in a holder claim is not shared equally by all stockholders because not all stockholders will have relied on the corporation's misrepresentations and abandoned plans to sell their shares. *See In re Countrywide Corp. S'holders Litig.*, 2009 WL 846019, at *12 (Del. Ch. Mar. 31, 2009) ("[H]older claims are individual in nature [because they] require a merits determination of facts [that are] uniquely individual.").

[75] We note, however, that other courts have recognized that holder claims are direct under Delaware law. *See, e.g.*, *In re Harbinger Capital Partners Funds Inv'r Litig.*, 2013 WL 5441754, at *9 (S.D.N.Y. Sept. 13, 2013) ("[T]o the extent that Plaintiffs' claims involve the nondisclosure of information . . . , Delaware cases establish that these so-called 'holding' claims are direct."), *vacated in part*, 2013 WL 7121186 (S.D.N.Y. Dec. 16, 2013); *In re Parkcentral Global Litig.*, 2010 WL 3119403, at *6 (N.D. Tex. Aug. 5, 2010) (explaining that because no special injury is required to assert a direct claim under Delaware law, the plaintiffs could bring holder claim directly). *But see* EDWARD P. WELCH ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 327.02[B][6], at 13-68 (6th ed. 2016) ("[F]ederal courts have been split concerning whether so-called 'holder' claims are direct or derivative under Delaware law.") (compiling cases).

28

claims, which are direct claims that are personal to the holder.[76] Purchaser, seller, and holder claims all involve very difficult questions of proof and damages, and holder claims just entail proving the additional requirement of inducement. This admittedly can be said to compound, not just marginally add to, those complex questions of proof and damages. That is, a holder claim plaintiff must prove that she would have sold her securities in some particular time period had she had certain information at that time.[77] Because securities holders may decide whether to hold or sell stock for various reasons, proving inducement is difficult.[78] The speculation arguably inherent in this added element has led states to be rightly cautious about creating broad causes of action for securities holders, as opposed to sellers or purchasers, a caution our state law has shared.[79] That issue, however,

---

[76] *See In re El Paso*, 132 A.3d at 88 ("'Quintessential examples of personal claims would include . . . a tort claim for fraud in connection with the purchase or sale of shares.'" (quoting *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2015))); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 88–89 (2006) (holding that the Securities Litigation Uniform Standards Act preempts state law holder claims brought as class actions because a "holder class action . . . is distinguishable from a typical Rule 10b-5 class action in only one respect: [i]t is brought by holders instead of purchasers or sellers," which is an "irrelevant" distinction in this context); 12B FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPS. § 5911, at 447 (2002 Supp. 2009) (noting that a claim "on a fraud affecting the shareholder directly" is a direct claim).

[77] *See Grant Thorton*, 314 S.W.3d at 927–28; *Starr Found.*, 901 N.Y.S.2d at 250.

[78] *See Star Found.*, 901 N.Y.S.2d at 249 ("Here, the Foundation seeks to recover the value it might have realized from selling its shares during a period when it chose to hold, under hypothetical market conditions for [the defendant corporation's] stock (assuming disclosures different from those actually made) that never existed. A lost bargain more undeterminable and speculative than this is difficult to imagine." (internal quotation marks omitted)).

[79] *See Malone v. Brincat*, 722 A.2d 5, 12–13 (Del. 1998).

does not transmogrify a common law fraud or negligent misrepresentation claim belonging to the security holder under state law into one belonging to the issuer.

Having answered the certified question, the Clerk is directed to transmit this opinion to the Second Circuit.